Filed 3/3/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HELENA PAPPAS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CAROLYN CHANG,<br><br>Defendant and Respondent. | A159792<br><br>(San Francisco County<br>Super. Ct. No. CGC18571679) |
| HELENA PAPPAS,<br><br>Plaintiff and Respondent,<br>v.<br>CAROLYN CHANG,<br><br>Defendant and Appellant. | A160293<br><br>(San Francisco County<br>Super. Ct. No. CGC18571679) |

These consolidated appeals arise out of the settlement of a medical malpractice claim made by appellant Helena Pappas against respondent Carolyn Chang, M.D., more accurately the aftermath of a settlement of that claim. The settlement was made at a June 29, 2018 mediation where, represented by counsel, they agreed that Dr. Chang would pay Pappas $100,000. Both parties and their counsel signed a settlement agreement, one paragraph of which provided in part that Pappas "will execute a release of all claims, including waiver of Civil Code [section] 1542, in a more comprehensive settlement agreement . . . ; said release to include a provision

1

for mutual confidentiality as to the facts of the underlying case, the terms and amount of this agreement."

The parties thereafter communicated for many months as to the terms of the "more comprehensive settlement agreement" and "a provision for mutual confidentiality," to no avail, in the course of which Pappas discharged her attorney and, representing herself, advised Dr. Chang's attorney that she would only comply with a provision for confidentiality if she received $525,000.

Still representing herself, Pappas sued Dr. Chang in a one-count complaint alleging breach of contract. Pappas retained new counsel and the case proceeded to a short bench trial, at the conclusion of which the trial court issued a 13-page statement of decision finding against Pappas "because she has not signed a 'more comprehensive settlement agreement' and release which includes a provision for mutual confidentiality."

Once again representing herself, Pappas appeals in case No. A159792, the first of the two consolidated appeals before us, essentially arguing that she need not provide a confidentiality provision and, in any event, such provision is against public policy and illegal, in violation of two sections of the Business and Professions Code. The arguments were rejected by the superior court. We reject them as well, and therefore affirm the judgment in case No. A159792.

The second appeal is in case No. A160293, where Dr. Chang appeals after the trial court denied her attorney fees as costs of proof at trial. (Code Civ. Proc., § 2033.420.) She contends the trial court abused its discretion when it determined that Pappas's denial of two requests for admission was based on a good faith belief she would prevail at trial and that the requests

2

went to the ultimate issue in the case. We reject Dr. Chang's claim as well, and therefore affirm the order in case No. A160293.

BACKGROUND

### The General Setting, the Settlement at Mediation, and the Aftermath

In June 2016, Dr. Chang, a board-certified plastic surgeon, performed cosmetic surgery on the upper and lower eyelids of both of Pappas's eyes, in a procedure technically known as blepharoplasty.

In September 2017, represented by attorney Constantine Panagotacos, Pappas made a demand for arbitration, pursuant to the parties' patient-physician agreement, alleging that Dr. Chang had been negligent in her care and treatment of Pappas.

The parties agreed to participate in mediation, which resulted in a settlement agreement signed on June 29, 2018. That agreement, executed by both parties and their attorneys, was 24-lines long, with these five substantive paragraphs:

"1. [Dr. Chang] will pay [Pappas] the total sum of $100,000.00.

"2. [Pappas] will execute a release of all claims, including waiver of Civil Code [section] 1542, in a more comprehensive settlement agreement and file a Request for Dismissal with Prejudice; said release to include a provision for mutual confidentiality as to the facts of the underlying case, the terms and amount of this agreement. This confidentiality includes, but is not limited to, any print, video, internet, or other media of any kind. The confidentiality agreement will not include disclosure to tax or financial advisors or to any disclosures required by law. The inclusion of the confidentiality agreement is not a material term of this settlement, and no consideration was offered and/or paid for it. The parties' mutual promises of confidentiality are the sole consideration for this confidentiality provision.

3

The healthcare practitioners retain the right to disclose and discuss as necessary for professional matters.

"3. [Pappas] will satisfy any and all liens.

"4. Each party to bear their own fees and costs.

"5. The parties intend that this document be enforceable pursuant to [Code of Civil Procedure] section 664.6, and that it constitutes a binding contract, and facsimile and/or email signatures are sufficient."

As described in detail below, Pappas and Dr. Chang, acting originally through counsel—Mr. Panagotacos and Elisabeth Madden, respectively—attempted to agree on the terms of a more comprehensive settlement agreement and a confidentiality provision, which attempts continued after Pappas discharged Mr. Panagotacos.

The attempts were not successful, and on November 29, 2018, Pappas filed suit against Dr. Chang, alleging one cause of action for breach of contract.

Dr. Chang filed an answer denying the allegations, and also asserting affirmative defenses, including that Pappas was herself in breach; that she had not performed an essential term of the contract; and that her subsequent communications and conduct had disavowed and repudiated the agreement.

On January 8, 2019, Pappas filed a motion to enforce the settlement, pursuant to Code of Civil Procedure section 664.6.

On January 9, Dr. Chang filed a petition to compel a return to arbitration and a request to stay all proceedings.

On February 21, the trial court denied Pappas's motion to enforce the settlement on the ground that the court did not have jurisdiction under Code of Civil Procedure 664.6 because there was no pending litigation when the parties agreed their settlement agreement could be enforced pursuant to that

4

statute. That same day, the court also denied Dr. Chang's petition on the ground that the settlement agreement contained no arbitration provision and that Pappas's breach of contract claim was based on an alleged breach of the settlement agreement, not Dr. Chang's alleged medical malpractice.

**The Trial**

In September 2019, a court trial on Pappas's complaint was held before the Honorable Mary Wiss, a most experienced superior court judge. Pappas was once again represented by counsel, now by George Wolff; Dr. Chang continued to be represented by Ms. Madden. Both parties filed trial briefs, and testimony was taken over two days. The only witnesses were Pappas and Dr. Chang. Many exhibits were introduced, exhibits and testimony that revealed the following:

On July 6, eight days after the agreement reached at mediation, Ms. Madden forwarded to Mr. Panagotacos a "confidential release agreement" (hereafter sometimes the "July 6 agreement"). Paragraph 5 provided that in consideration of a release of all claims, Pappas would be provided with a check for $29,999.99 from the Doctors Company, a professional liability insurer, in settlement of all claims against Dr. Chang, plus an additional check in the amount of $70,000.01 to be paid by Dr. Chang. And paragraph 13 set forth a confidentiality agreement that bound Pappas and included an attorney fees provision in the event of breach.

Pappas refused to sign it. As Judge Wiss would come to put it, "Following the mediation [Pappas] became convinced that the confidentiality provisions of both the 6/29/18 Mediation Settlement Agreement and the 7/6/18 Confidentiality Release Agreement were overbroad and illegal and therefore void as contrary to law. [Pappas] testified that after the mediation it became more and more clear to her that Dr. Chang intended to avoid

5

reporting the settlement to the California Medical Board as required by Health [and] Safety Code section 802.01 and that the settlement agreements were designed to prevent [Pappas] from filing a complaint against Dr. Chang with the California Medical Board."

On August 31, Pappas discharged Mr. Panagotacos. Pappas received a copy of her file from him, which included a July 18 email from Ms. Madden in which she confirmed that Dr. Chang would not prohibit Pappas from "responding and disclosing to the Medical Board," and proposed this new language for the confidentiality provision: "This provision does not prohibit Releasor from disclosures to the California Medical Board or any other government agency if such information is requested by the Board or another government authority." And the email concluded, "I am concerned that she might make a complaint to the Board. She is not legally required to do that."

Pappas testified that the email further confirmed her belief that the June 29 and July 6 agreements prohibited her from making a complaint to the Medical Board. She also testified that she anonymously called the Medical Board, described the two checks, and was told that it looked like an attempt not to report the settlement.

We digress briefly from the communication and email chronology to quote Judge Wiss's description of Dr. Chang's position: "Dr. Chang also adamantly asserted that she is well familiar with the reporting requirements and knows and understands her obligations to report settlements of $30,000 or more to the Medical Board. She disputes that she ever intended to hide the settlement from the Medical Board. Dr. Chang testified that she agreed to pay the additional $70,000.01 because that's what it would take to settle the matter and she wanted to resolve a dispute with a patient and put it

behind her."[1]  Moreover, Dr. Chang testified her settlement with Pappas "has never been about the Medical Board," but about the release of all claims and the confidentiality agreement.  She understood that under the terms of the settlement agreement, "those disclosures required by law have to be reported to the Medical Board" and that she or her insurance company would be obligated to report the settlement because she was paying Pappas an amount exceeding $30,000.

Returning to the chronology, on September 18, Ms. Madden sent an email to Pappas in which she confirmed that Pappas had told her that she did not "feel that the confidentiality clause [in the July 6 Agreement] reflects a meeting of the minds on that issue," and that Pappas was not comfortable signing a release that contains any reference to confidentiality.  And in the email Ms. Madden offered to revise the confidentiality provision so that it read exactly as stated in the June 29 agreement.

Despite that, in conversations with Ms. Madden, Pappas continued to refuse to agree to any settlement agreement that contained a confidentiality clause, as manifest by this point-blank testimony at trial:

"So, as of September 18th, 2018, even with a release agreement that had the exact language from the June 29, 2018 agreement, you still would—would not accept that release, right?

"That's correct."

In a September 21 email, Ms. Madden stated that Dr. Chang was willing to sign a release agreement with a mutual confidentiality provision "stated exactly as it was stated in the June 29, 2018 settlement agreement."

---

[1] Beyond that, as Judge Wiss expressly noted, further testimony as to the reason there were two settlement checks was limited due to the mediation and attorney-client privileges.

7

The email also noted that Pappas had "indicated that you are not willing to sign a release agreement that includes *any* reference to confidentiality, even if it is the exact language used in the settlement agreement . . . and that you require additional money to sign a release agreement that includes a non-disparagement and confidentiality clause," for a total payment of $525,000. Ms. Madden further stated she had asked Pappas to "provide me with the language which you would be willing to agree to if your additional monetary demands were satisfied.  You indicated that you would be willing to do that . . . ."

Then, in a September 24 email, Pappas confirmed that she would enter into a settlement agreement that included confidentiality if she were paid $525,000.  This is how Pappas put it:  "for purposes of trying to resolve this matter with Dr. Chang at this juncture, the $525,000 amount I requested [in an earlier telephone call] is comprised of $250,000 in non-economic damages as set forth in my mediation brief, plus $275,000 in economic damages." Pappas's email also proposed the following confidentiality language: "Releasor agrees that she will not disclose this Agreement, the terms of this Agreement, or the amount of the settlement, to any third parties unless she is otherwise legally permitted to do so.  Releasor may confidentially disclose the amounts, to the extent necessary, to her financial or tax advisors. Nothing in this settlement agreement prohibits or restricts Releasor from discussing or reporting the underlying facts, results, terms, and conditions of this settlement agreement to the Department of Managed Health Care/Medical Board of California.  For income tax purposes, Releasor is accepting $1,000 of the payment in full consideration for this provision."

Ms. Madden responded by email that same day, advising that the June 29 agreement confidentiality provision "does not prohibit or restrict you

8

from cooperating or communicating with the Medical Board.  If that is your concern, then we can include your clarification sentence within the existing Release Agreement . . . and we can distribute the settlement checks in the amount of $100,000 in accord with our existing settlement agreement."

Later that day, Pappas responded to Ms. Madden's email by stating, "The answer to your question is no.  My position remains that there was no meeting of the minds on the confidentiality [provision] so I will not sign the existing release agreement with a confidentiality [provision] in it."

Then, in a September 27 email to Pappas, Ms. Madden wrote this: "As stated, it remains our position that the June 29, . . . settlement agreement that you and your legal counsel signed is a binding and enforceable contract.  The only issue that you raised with the release agreement concerned the confidentiality provision which I have re-worded to mirror the exact language stated in the settlement agreement regarding mutual confidentiality.  I further informed you that we do not have any objection to the language you proposed for the release agreement regarding confidentiality.  You have stated that you will not comply with the terms of the settlement agreement unless you receive more money, specifically, $525,000.  [¶]  We remain prepared to honor the terms of the existing settlement agreement, but as it appears that you are not willing to do, [*sic*] we wish to continue with the arbitration process pursuant to the Binding Arbitration Agreement and the Demand for Arbitration. . . ."

Almost a year after the mediation—and months after she had filed her lawsuit—Pappas prepared and signed a new "Confidential Release Agreement" dated June 7, 2019, that she served on Ms. Madden on June 17. This agreement provided in paragraph 5 that $100,000 (consisting of two payments of $29,999.99 and $70,000.01) would be made solely to Pappas;

9

recited Civil Code section 1542 (incorporating the pre-2019 language), and in paragraph 13 provided: "Releasor may confidentially disclose the amount of this settlement, to the extent necessary, to her financial or tax advisors. Releasor and Releasee further agree to conduct themselves in accordance with California Business and Professions Code section 2220.7." This, Pappas admitted, "did not limit any disclosures about the facts of the case, the allegations, or the settlement by either [her or Dr. Chang.]"

In May 2019, Pappas filed a complaint with the Board, testifying she did so because she had received a response to a request for admission in which Dr. Chang admitted that Pappas could give a copy of the settlement agreement to the Board.

Following the conclusion of the evidence, Mr. Wolff and Ms. Madden made closing arguments, and the matter was submitted.

Pappas had requested a statement of decision, and Judge Wiss issued what she called her proposed statement of decision. Pappas filed objections, to which Dr. Chang responded. And on November 12, a hearing was held on those objections, at the conclusion of which Judge Wiss took the objections under submission.

On November 22, Judge Wiss issued her statement of decision, a comprehensive statement indeed. Following a brief recital of the procedural background, it went on for four pages discussing the "factual background," in the course of which Judge Wiss set forth in detail the testimony, much of which is described above. The statement then set forth the "parties' claims and relief sought," and then proceeded to Judge Wiss's "discussion," the first paragraph of which ends with this: "Because [Pappas] has not complied with the agreement to execute a release which includes confidentiality, she has failed to perform her part of the bargain and her breach of contract claim

10

fails." And from there, Judge Wiss went on to analyze—and reject—Pappas's arguments, with these headings: "A) The 6/29/18 Settlement Agreement is not Severable"; "B) The 6/22/18 and 7/6/18 Settlement Agreements are not Overbroad, Void or Illegal"; "C) The Mutual Confidentiality Clause was not Illusory"; and "D) [Pappas] Agreed to Execute a Release Which Includes Mutual Confidentiality."

On December 3, Judge Wiss entered judgment in favor of Dr. Chang.

**Post-Trial Proceedings**

On December 19, Pappas filed motions to vacate the judgment and for a new trial.

On December 23, Dr. Chang filed a motion for attorney fees as costs of proof at trial pursuant to Code of Civil Procedure section 2033.420, based on what she claimed were Pappas's unreasonable denials of two requests for admissions.

On January 30, 2020, Pappas filed a notice of appeal and an amended notice of appeal, docketed in this court as case No. A159792.

On February 7, Judge Wiss entered orders denying Pappas's motions to vacate and for a new trial, and denying Dr. Chang's motion for costs of proof fees.

On February 14, Pappas filed a second amended notice of appeal from the judgment and from the orders denying her post-trial motions.

On April 3, Dr. Chang filed a notice of appeal from the order denying her motion for attorney fees. And we thereafter granted Dr. Chang's unopposed motion to consolidate the two appeals for purposes of briefing, oral argument, and decision.

On July 7, 2021, we granted the Center for Public Interest Law's application for leave to file an amicus curiae brief in support of Pappas.

11

## DISCUSSION

### Introduction

Pappas has filed a 69-page opening brief, included within which is a seven-page "Statement of the Case." Within those pages are references to Pappas's testimony at trial, and documents she introduced she claims supports her position. There are also statements impugning Dr. Chang and her testimony. But nowhere in Pappas's brief is there a meaningful exposition of the facts as found by Judge Wiss, let alone reference to those facts to the extent they support the judgment below. This is most inappropriate.

California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts . . . ." And as to this, the leading California appellate commentary instructs: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations, and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, . . . may draw sanctions [citation], and may well cause you to lose the case." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 9:27, italics omitted.) Pappas's brief ignores such instruction.

Likewise does her brief ignore the principle that all evidence must be viewed most favorable to Dr. Chang and in support of the judgment. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Co. v. Fallon* (1971) 3 Cal.3d 875, 881; see *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 ["Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the

12

evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision"].)

**Pappas Was Not Excused from Executing a More Comprehensive Settlement Agreement Containing a Confidentiality Provision**

As quoted above, paragraph 2 of the settlement agreement provides in relevant part: "[Pappas] will execute a release of all claims, including waiver of Civil Code [section] 1542, in a more comprehensive settlement agreement . . . ; said release to include a provision for mutual confidentiality . . . ."

Pappas's opening brief has four arguments, set forth in the table of contents as arguments Numbers A, B, C, and D. The first three of the arguments are related and will be so treated by us. These arguments are as follows:

"A.  The Executed Settlement Agreement Is Enforceable As Written Despite The Failure Of The Parties To Subsequently Agree On The New Terms Of A 'More Comprehensive Settlement Agreement.'

"B.  The Provision Of The Settlement Agreement Requiring The Payment of $100,000 In Exchange For A Civil Code [Section] 1542 Release Of Claims Are Independent Of The Agreement To Agree On The Provisions Of Some New Form Of [A] 'More Comprehensive' Settlement Agreement And Confidentiality Agreement" and

"C.  To The Extent That The Settlement Agreement Required The Parties To Agree On New Terms Or A 'More Comprehensive Settlement Agreement,' That Requirement Is Unenforceable."

The arguments essentially contend that the language in the June 29 agreement stating that it is a binding contract and that the confidentiality provision is not material means that the June 29 agreement alone sufficed.

13

Judge Wiss found to the contrary, that the "plain language" of the settlement agreement providing for the execution of a "more comprehensive settlement agreement" reflected both parties' intent that a subsequent agreement would contain a provision for confidentiality. She also rejected Pappas's contention that "her 6/7/19 [executed release] agreement suffices as performance for her part of the bargain for payment of the $100,000.00," expressly noting that "[Pappas's] 6/7/19 [release agreement] does not include any of the confidentiality terms required by the 6/29/18 Settlement Agreement." In short, as Judge Wiss concluded, "[Pappas] failed to perform her part of the bargain to execute a release including a confidentiality provision in exchange for payment of $100,000.00." Put in contract terms, Pappas failed to prove performance. And her breach of contract claim fails. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 ["[T]he elements of a cause of action for breach of contract are . . . (2) plaintiff's performance or excuse for nonperformance . . ."].)

The June 29 agreement was clear: a "more comprehensive settlement agreement . . . to include a provision for mutual confidentiality" would follow. That was the express recitation of the parties' agreement. But not only that, Pappas's sworn testimony confirmed it.

Pappas, who was represented by counsel, read and signed the June 29 agreement. And, she admitted, she understood that by signing it she was "agreeing to be bound by the promises" she was making in the agreement—contractual promises she fully intended to honor. Pappas specifically admitted she understood and agreed that in exchange for receiving $100,000, she would keep the amount of the settlement, the terms of the settlement, and her allegations against Dr. Chang confidential, and that she was "going to sign a comprehensive settlement agreement that had a release of all claims

14

in it," this, in a subsequent agreement that would include a provision for mutual confidentiality.

For her part, Dr. Chang likewise testified that she understood the release to be signed by Pappas would include a provision for mutual confidentiality as described in the settlement agreement. Indeed, Dr. Chang testified, she would not have settled if confidentiality surrounding the terms and amount of the settlement was not part of the agreement.

Pappas argues that because the June 29 agreement stated it was binding and also recited some confidentiality language, she was not required to execute a release agreement containing a redundant confidentiality provision. The language in the June 29 agreement says otherwise, that the confidentiality provision be included in a "more comprehensive settlement agreement," expressly requiring the parties to execute a subsequent agreement containing, among other things, a confidentiality provision. As Judge Wiss concluded: "The 6/29/18 Settlement Agreement is not an integrated agreement. The plain language of the agreement recites that the settlement will be set forth in a 'more comprehensive settlement agreement.' Thus, both parties understood it was not the final expression of their entire agreement."

What Pappas appears to argue is that, upon signing the June 29 agreement she was entitled to payment of $100,000 without doing anything further simply because the agreement itself is enforceable. But such position conflates two distinct issues: whether the June 29 agreement was enforceable, and whether she can compel Dr. Chang's performance under the agreement without herself performing what is called for by it. Thus, the two cases primarily relied on by Pappas—*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39 (*Blix Street*) and *J.B.B. Investment Partners Ltd. v.*

15

*Fair* (2019) 37 Cal.App.5th 1 (*J.B.B.*)—are easily distinguishable, both cases involving the question of whether a preliminary settlement agreement was enforceable—not whether the parties seeking to enforce it had performed their end of the bargain.

In *Blix Street*, following the start of a trial, the parties agreed to settle a claim regarding the rights to royalty payments and plans for a motion picture, and in open court Blix Street and Straw confirmed the existence of a short-form settlement agreement and its enforceability. (*Blix Street, supra*, 191 Cal.App.4th at pp. 43–44.) They then retained new counsel, and took a contrary position, that the short-form agreement was not binding or enforceable due, in part, to "ambiguities of a substantive nature" in the agreement that the parties needed to resolve in a long-form agreement. (*Id.* at pp. 44–45.) The trial court held that Blix Street was judicially estopped from disclaiming the enforceability of the short-form agreement by virtue of the representations it had made to the court. (*Id.* at pp. 46, 49–51.) The Court of Appeal affirmed.

In *J.B.B.*, a decision of this court, the issue was whether the parties' exchange of emails created a binding agreement. There, plaintiffs emailed defendants a "last and final" settlement offer with all of the terms expressly detailed in the offer letter. (*J.B.B.*, *supra*, 37 Cal.App.5th at pp. 10–11.) Defendant responded with multiple emails accepting the offer, and included a statement that said, " 'This confirms full agreement, and I will work on the formal settlement paperwork which will conform to the settlement agreement made today based on the 10 numbered paragraphs. . . .' " (*Id.* at p. 11.) Defendants later refused to sign a final draft of the settlement agreement.

Plaintiffs ultimately obtained summary adjudication on their claim for breach of contract. (*J.B.B.*, *supra*, 37 Cal.App.5th at pp. 5–7.) We affirmed,

holding that although the parties still needed to execute a more formal written agreement, and although there were additional terms included in the more formal written agreement sent by plaintiffs' attorney that had not been included in the offer letter, those facts did not alter the validity of the preliminary settlement agreement. (*Id*. at p. 12.)

Here, by contrast, there is no issue of the enforceability of the June 29 agreement, and certainly Dr. Chang never took the position that the agreement was unenforceable. The issue was simply Pappas's performance—performance she failed to prove.

Judge Wiss also rejected Pappas's claim that the confidentiality provision was not a material part of the settlement. Properly so. It is perhaps enough to note that the June 29 agreement had language requiring inclusion of such a provision. In addition, in support of her finding that the confidentiality provision was material, Judge Wiss cited the lengthy negotiations between the parties regarding the wording and scope of the provision. And, she determined, the language regarding materiality in the settlement agreement "was intended to avoid taxability of a portion of the settlement"—a determination, not incidentally, supported by the proposed confidentiality provision Pappas sent to Ms. Madden in her September 24 email, which not only did not mention materiality, but repeated that Dr. Chang was "accepting $1,000 of the payment in full consideration for this provision."

Pappas also argues, however briefly, that the provision calling for a "more comprehensive settlement" is unenforceable, on the claimed basis that the intentions of the parties are "unspecified, vague and uncertain." We see nothing here meeting those adjectives. The mediator knew what the agreement meant. So did the attorneys. And so did Pappas and Dr. Chang.

17

**The Confidentiality Agreement is not Overbroad or Illegal**

Pappas's last argument is that "The 'Confidentiality Agreement' Within The Settlement Agreement Is Overbroad, Illegal, And Violates Public Policy." The argument essentially argues that the confidentiality agreement is illegal because (a) it was intended to prevent her from filing a complaint with the Medical Board in violation of Business and Professions Code section 2220.7[2] and (b) contains a provision regarding payment of the settlement sum that is intended to avoid reporting the settlement in violation of Business and Professions Code section 801.01.

As noted, Judge Wiss rejected Pappas's claims. As to Business and Professions Code section 2220.7, Judge Wiss said this: "[a]lthough [Dr. Chang] appears concerned that [Pappas] would file a complaint with the Medical Board, the 6/29/18 Settlement Agreement provides for mutual confidentiality *as to the underlying case, the terms and amount of this settlement agreement* but does not prohibit *disclosures required by law*. And,

---

[2] Section 2220.7 provides:

"(a) A physician and surgeon shall not include or permit to be included any of the following provisions in an agreement to settle a civil dispute arising from his or her practice, whether the agreement is made before or after filing the action:

"(1) A provision that prohibits another party to the dispute from contacting or cooperating with the board.

"(2) A provision that prohibits another party to the dispute from filing a complaint with the board.

"(3) A provision that requires another party to the dispute to withdraw a complaint he or she has filed with the board.

"(b) A provision described is subdivision (a) is void as against public policy.

"(c) A physician and surgeon who violates this section is subject to disciplinary action by the board."

Paragraph 13 of the 7/6/18 Confidential Release Agreement provides that [Pappas] 'will not disclose *the Agreement . . .* unless she is otherwise legally required to do so.' The two agreements do not preclude a complaint to the Medical Board, but as worded provide for confidentiality of the *case and the terms and amount of the settlement agreement* unless disclosure is required by law." Indeed.

Beginning with the June 29 agreement, it specifically states that the confidentiality agreement does not cover "any disclosures required by law." And while Pappas points to Ms. Madden's July 6 email, this was just the beginning of a series of communications that culminated with the email exchange discussed above between Pappas and Ms. Madden that clearly addressed Pappas's claimed concern about not being able to contact the Board. The email correspondence also shows that once it became clear that Dr. Chang would not pay her an extra $425,000 for confidentiality, Pappas refused to execute a release agreement containing *any* confidentiality provision, even one that expressly stated that she was permitted to contact the Board. In short, whatever Pappas's initial concerns about the claimed illegality of the confidentiality terms, they no longer existed.

But even if there were some question about the July 6 agreement, Judge Wiss's resolution of the issue was in accord with a fundamental rule of contract interpretation, " '[i]f a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect.' " (*Edwards v. Arthur Anderson LLP* (2008) 44 Cal.4th 937, 953–954 (*Edwards*), quoting among other cases *Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 160; see Civ. Code, § 3541 ["An interpretation which gives effect is preferred to one which makes void"].)

19

*Edwards* is instructive. There, in a dispute between an employer and its former employee, one issue involved a contract provision requiring the employee to release "any and all" claims. The Court of Appeal held that the release purported to waive the employee's indemnification rights under the Labor Code and was therefore in violation of public policy. The Supreme Court reversed. Noting that " 'it is one of the cardinal rules of interpreting an instrument to give it such construction as will make it effective rather than void' " (*Edwards*, *supra*, 44 Cal.4th at p. 954, quoting *Toland v. Toland* (1898) 123 Cal. 140, 143), the court held that the contract provision releasing "any and all" claims did not encompass nonwaivable statutory protections, such as the employee indemnity protection of Labor Code section 2802. (*Edwards*, *supra*, at p. 954.) The court found it significant that the release "did not expressly reference indemnity rights," and should not be read as encompassing a waiver of those rights. (*Ibid*.) Moreover, the court noted, in interpreting the release, it would presume that defendant employer knew an employee's indemnity rights were statutorily nonwaivable and thus treated the release as expressly incorporating the law that an employee cannot waive that right. (*Id*. at pp. 954–955.)

Likewise here. Judge Wiss found that the June 29 settlement agreement had no express reference to communications with the Medical Board and thus should not be applied to preclude such communications. And the law presumes that the contracting parties—here, a lawyer and a licensed physician, both acting through counsel—knew the law as set forth in Business and Professions Code section 2220.7. Beyond all that, the communications between Ms. Madden and Pappas confirm that the confidentiality language would not prohibit Pappas from reporting to the Board.

20

Pappas also contends that the confidentiality clause is void because it circumvents Business and Professions Code section 801.01, subdivision (a)(1) requiring settlements of $30,000 or more to be reported to the Medical Board.[3] The basis of the argument is the reference in the July 6 agreement from Ms. Madden to the two settlement checks of $29,999.99 and $70,000.01.

In her statement of decision, Judge Wiss expressly rejected this argument. As she put it, "The 7/6/18 Release (which the insurer would no doubt require before making payment) clearly states that the amount of the settlement is $100,000.00 and obligates the insurer to report the settlement to the Medical Board." And, she added, "Dr. Chang credibly testified that she was well aware of the reporting requirements. She testified that she paid the additional $70,000.01 because she wanted to be done with the case and conclude the litigation with a former patient. [Pappas's] speculation as to the reason for the split checks does not excuse her performance under the contract." As Dr. Chang expressly testified, she understood that under the

---

[3] Section 801.01 provides in relevant part:

"The Legislature finds and declares that the filing of reports with the applicable state agencies required under this section is essential for the protection of the public. It is the intent of the Legislature that the reporting requirements set forth in this section be interpreted broadly in order to expand reporting obligations.

"(a) A complete report shall be sent to the Medical Board of California . . . with respect to a licensee of the board as to the following:

"(1) A settlement over thirty thousand dollars ($30,000) . . . of a claim or action for damages for death or personal injury caused by the licensee's alleged negligence, error, or omission in practice . . . . [¶] . . . [¶]

"(b) The report shall be sent by the following:

"(1) The insurer providing professional liability insurance to the licensee.

"(2) The licensee, or the licensee's counsel."

21

terms of the settlement agreement, "those disclosures required by law have to be reported to the Medical Board," and that she or her insurance company would be obligated to report the settlement because she was paying Pappas an amount exceeding $30,000.

As to the breakdown of the payments as described in the July 6 agreement, it might be fair to describe this, as we did at oral argument, as unusual to those not familiar with the situation, which breakdown is the subject of much discussion in Presiding Justice Kline's separate opinion. Any explanation for such breakdown was necessarily constrained by the mediation privilege, and at oral argument Ms. Madden represented that what she "could say" was that medical malpractice insurers are frequently unwilling to make substantial offers if the case appears to have no merit.[4] Such, of course, would appear to be something that could be shown by evidence of such practice, but no such evidence was provided here.

In a brief argument, Pappas contends that the confidentiality provision is void and against public policy because Dr. Chang altered her medical records and the provision is being used to conceal a crime and withhold evidence. She relies in claimed support on Business and Professions Code 2262 and Penal Code sections 471.5 and 153.[5]

---

[4] Here, Dr. Chang testified that the chairman of plastic surgery at UCSF opined that there was "no negligence . . . no malpractice."

[5] Business and Professions Code section 2262 provides in part: "Altering or modifying the medical record of any person, with fraudulent intent, or creating any false medical record, with fraudulent intent, constitutes unprofessional conduct." Penal Code section 471.5 provides: "Any person who alters or modifies the medical record of any person, with fraudulent intent, or who, with fraudulent intent, creates any false medical record, is guilty of a misdemeanor." And Penal Code section 153 prohibits payment of money for concealing a crime or withholding evidence of a crime.

Judge Wiss concluded the issue of whether there was any alteration of medical records was being litigated at the time of the mediation, and that Dr. Chang denied that there was any alteration. And because the matter was settled, there was no finding that an alteration of the medical records occurred, much less any alteration with fraudulent intent.

**Dr. Chang's Appeal Has No Merit**

In her appeal, Dr. Chang contends Judge Wiss erred in holding that Dr. Chang was not entitled to attorney fees as costs of proof pursuant to Code of Civil Procedure section 2033.420. This is the background:

After prevailing at trial, Dr. Chang moved for attorney fees as costs of proof at trial, contending that Pappas had "unreasonably denied two requests for admissions which, if admitted, would have resolved the entire case and resulted in a dismissal." The requests were served on March 1, 2019, some three months after Pappas's complaint was filed, and before either party had been deposed. Pappas served responses on April 2.

The two requests and responses were as follows:

"<u>REQUEST FOR ADMISSION NO. 12</u>:

"Admit that YOU have not fulfilled any of the terms of the June 29, 2018 Agreement."

"<u>RESPONSE TO REQUEST FOR ADMISSION NO. 12</u>:

"Deny that [Pappas] failed to fulfill any material terms of the June 29, 2018 agreement."

"<u>REQUEST FOR ADMISSION NO. 13</u>:

"Admit that [Dr. Chang] does not owe YOU any money."

"<u>RESPONSE TO REQUEST FOR ADMISSION NO. 13</u>:

"Deny. [Dr. Chang] owes [Pappas] $100,000 per the material terms of [the settlement agreement]."

In her motion, Dr. Chang requested $26,620 in costs of proof attorney fees "based on the 133.1 hours of time spent by her counsel in proving these facts at trial." The motion was based on Code of Civil Procedure section 2033.420, which provides:

"(a) If a party fails to admit . . . the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves . . . the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

"(b) The court shall make this order unless it finds any of the following: [¶] . . . [¶]

"(3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter.

"(4) There was other good reason for the failure to admit."

Following a hearing, Judge Wiss entered an order denying the motion, holding as follows: "The Requests [for admissions] are of substantial importance; indeed they go to the heart of [Pappas']s breach of contract case. However, the Requests also go to the ultimate issue in the case. Based upon the presentation of the parties at trial, [Pappas's] denial was based upon a good faith belief that she would prevail at trial on these issues. [Code of Civil Procedure] Section 2033.420 does not operate to authorize attorney's fees simply because a party prevailed on the issues at trial. Such is not the language or intention of the statute. The motion is DENIED."

We review Judge Wiss's order for abuse of discretion. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1275–1276 (*Laabs*).) And find no abuse.

24

Dr. Chang first argues that notwithstanding Judge Wiss's finding that Pappas's denials were "based upon a good faith belief that she would prevail at trial," Dr. Chang was entitled to attorney fees because Pappas failed to show that her belief was reasonable, based on the evidence in support of her position. We are not persuaded, as given the issues discussed above involved in the litigation, Judge Wiss acted within her discretion in ruling as she did. (See *Laabs*, *supra*, 163 Cal.App.4th at p. 1276 ["In evaluating whether a 'good reason' exists for denying a request to admit, 'a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial' "].) Certainly Dr. Chang has shown no abuse. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

Beyond that, we also agree with Judge Wiss's alternative ground for denying Dr. Chang's motion, that the requests went "to the ultimate issue in the case." Recently, in *Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, we addressed a similar issue of requests for admissions that go to the heart of the adversary's case—indeed, requests, like those here, served very early in the litigation. There, several of the defendants served requests for admissions that "essentially asked plaintiffs to admit that they had no claim against [defendants]." (*Id.* at p. 128.) We reversed the trial court's award of fees, stating: "Frankly, we are troubled that a defendant can at the very inception of litigation, at a time when, as best we can tell, no discovery had taken place, and certainly no deposition, serve [requests for admissions] essentially seeking responses admitting that plaintiff had no case, and then, if plaintiff ultimately proves unsuccessful, recover costs of proof attorney fees, as here. This, it could be said, is tantamount to a form of

25

strict liability: make a claim; deny an early-served [request for admission] that the claim has no merit; vigorously pursue the claim; lose the claim; and pay. That cannot be the law." (*Id.* at pp. 130–131.)

The concern expressed in *Universal Home* is equally applicable here, where the requests for admissions were served very early in the case and essentially asked Pappas to admit she could not prevail at trial, with her denials then used to justify Dr. Chang's claim to costs of proof fees after prevailing at trial. Judge Wiss did not abuse her discretion when she refused to condone such tactics.

**Some Closing Observations**

As noted, we granted the application to file an amicus brief made by the Center for Public Interest Law, referred to in its brief as CPIL, the acronym we will use here.[6] CPIL is "a nonprofit academic center of research and advocacy in regulatory and public interest law at the University of San Diego School of Law," which, since 1986, "has taken a special interest in the Medical Board and its enforcement program" and has, inter alia, studied the Board's physician discipline system and sponsored related legislation.

Since 1993 CPIL has sponsored, drafted, and/or supported over two dozen pieces of legislation, and as particularly relevant here directly advocated before the Legislature concerning Business and Professions Code sections 2220.7 and 801.01. So, it is against that background CPIL appears as amicus here.

In its brief, CPIL recites that, "[i]n its oversight role over the Board, the Legislature has addressed, and passed laws to mitigate, unscrupulous tactics by physicians and their lawyers to prevent the Board from ever receiving

---

[6] At oral argument, counsel for CPIL advised that its name has changed.

26

information about a physician's conduct and allowing them to continue practicing without any scrutiny from the Board." And it goes on, "The facts presented by this case demonstrate precisely such tactics, and the policies put in place to prevent them. In its efforts to adjudicate this matter based on the contract negotiations alone, the trial court appears to . . . avoid the disclosure of the underlying incident to the Board in violation of two critical statutes: section 2220.7 of the Business and Professions Code, which prohibits 'regulatory gag clauses,' and section 801.01, which requires malpractice insurers to report malpractice settlements in excess of $30,000 to [the Board.]"

We note that CPIL's brief ignores several things, beginning with the fact the parties bargained for confidentiality. But perhaps more significantly, CPIL focuses its entire attention on the three weeks following the June 28 mediation, and ignores all the communications over the next months set forth in detail above.

That being said, we write to confirm the three public policy concerns that would be implicated by inappropriate confidentiality clauses. In the words of CPIL:

"First, regulated licensees should not be able to unilaterally deprive regulators of information about their own misconduct committed in the course and scope of the regulated business.

"Second, concealment from the regulator should not be 'on the table' during civil settlement negotiations. The civil tort system and the administrative process have very different purposes and standards. An outcome in one system (civil) should not necessarily dictate the outcome in the other (regulatory). Agencies should not be deprived of the discretion to investigate complaints.

27

"Finally, an injured patient or consumer should not be put in the position of having to decide between two competing incentives: 'I should take the money and run' vs. 'I'd really like to help prevent what happened to me from happening to others.' "[7]

In short, we agree wholeheartedly with EPIL's conclusion, that "the law prohibits the inclusion of any provision in any settlement agreement that stymies not only compliance with the law and proper inquiries made, but also the *right of the victim to report the applicable events to the agency*. The law also requires outside entities, such as professional liability insurers to report certain settlements to the Board to facilitate its oversight over physicians." That, however, is not an accurate picture of what occurred here.

## DISPOSITION

In case No. A159792, the judgment is affirmed. In case No. A160293, the order is affirmed. The parties shall bear their own costs on appeal.

---

[7] CPIL's brief goes on to immediately note that "[t]his is precisely the 'Catch 22' scenario in which [Pappas] found herself in this case, and her unwillingness to agree has since deprived her of the agreed-upon settlement funds." As noted, we read the record differently.

_____
Richman, Acting P. J.

I concur:


_____
Miller, J.

*Pappas v. Chang* (A159792; A160293)

Pappas v. Chang A159792, A160293

Concurring Opinion of Kline, J.*

 I agree with my colleagues that Pappas failed to perform her part of the bargain to execute a release including a confidentiality provision in exchange for payment of $100,000.  For that reason, I concur in the judgment.

 I write separately, however, because I feel my colleagues have not adequately described Chang's and her lawyer's repeated attempts to violate the Business and Professions Code and the whitewashing of those efforts by the trial judge.

 At the close of their opinion, my colleagues "wholeheartedly" agree with amicus curiae, the Center for Public Interest Law, that "regulated licensees should not be able to unilaterally deprive regulators of information about their own misconduct committed in the course and scope of the regulated business" by means of "a provision in a settlement agreement that stymies compliance with the law."  However, they go on to say, that "is not an accurate picture of what occurred here."  (Maj. opn. at p. 28.)

 I believe it is a very accurate assessment of what happened in this case.

 As will be seen, the confidentiality provisions repeatedly insisted upon by Chang were designed to prohibit Pappas from contacting or filing a complaint with the Medical Board of California (Board) in violation of statutes regulating the practice of medicine.  It is true that, in the end, the law was followed, not stymied.  But that is only due to the unusually obstinate rejection by Pappas of virtually all of Chang's unlawful proposals.

1

The Medical Practice Act (§§ 2000–2029) and related provisions of the Business and Professions Code¹ regulating the practice of medicine require the Board to rely heavily on patient complaints and mandated reports from other entities, such as insurers, hospitals, and courts.  Sections 2220.7 and 801.01 were specifically designed to prohibit obstruction of such reporting to the Board.

As material, section 2220.7 provides that "[a] physician and surgeon shall not include or permit to be included . . . in an agreement to settle a civil dispute arising from his or her practice . . . [¶] . . . [¶] (2) A provision that prohibits another party to the dispute from filing a complaint with the board," and such a provision "is void as against public policy."  (§ 2220.7, subds. (a)(2) & (b); see *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 131–132 [an agreement is unenforceable on grounds of public policy if the interest in its enforcement is "clearly outweighed" by a public policy].)

Section 801.01 commences with the declaration that the reporting requirements mandated by the Medical Practice Act "be interpreted broadly in order to expand reporting obligations" and requires professional liability insurers to send a complete report to the Board regarding a licensee's settlement over "$30,000 . . . of a claim or action for damages for . . . personal injury caused by the licensee's alleged negligence, error, or omission in practice[.]"  (§ 801, subds. (a)(1) & (b)(1).)

Chang's initial demand required the violation of both statutes.

¹ Further statutory references are to the Business and Professions Code.

2

From the beginning of this dispute, Pappas made clear her intention to communicate to the Board her view of Chang's professional negligence, by declaring that she would not settle her malpractice claims for less than $30,000, because that would relieve Chang's professional liability insurer of the statutory duty to report the settlement to the Board. Chang's proposal to require the insurer to pay $29,999.99 to settle all of her claims for a penny less than $30,000 "was reasonably seen by Pappas as a 'huge red flag' " indicating Chang's desire to unlawfully prevent disclosure of the settlement in this case to the Board.

Pappas also objected to a provision in the release agreement proposed by Chang's attorney, stating that "Releasor agrees that she will not disclose this Agreement, the terms of this Agreement, or the amount of the settlement to any third parties *unless she is otherwise legally required to do so*." (Italics added.) Pappas understood she was free to report her complaints about Chang to the Board or agree not to do so, but in the latter event the Board would have no basis upon which to request information from her.

The effect of the two provisions just described would have been to prevent Chang's insurer and Pappas herself from reporting the settlement and Pappas's malpractice claims to the Board.

After the parties began negotiating "the more comprehensive settlement agreement," Pappas, then representing herself, found an email dated July 18, 2018, from Chang's attorney Elizabeth Madden, to Pappas's former counsel stating that "we cannot prohibit responding and disclosing to the Medical Board, and I thought that was covered with the first line—stating 'unless otherwise legally required to do so.' However, I do not have a problem with making it clearer." Madden's solution was to add a sentence to

3

the confidentiality provision, stating, "This provision does not prohibit Releasor from disclosures to the California Medical Board or any other government agency *if such information is requested by the Board or another government authority*." (Italics added.) Madden said she desired this modification because "I am concerned that [Pappas] may make a complaint to the Board," and "[s]he is not legally required to do that."

Pappas rejected the proposed modification. As she testified, Madden's email made it "pretty clear" that the confidentiality provision Chang wanted continued to preclude her from voluntarily complaining to the Board, which was the only way to induce it to request information supporting her claims.[2]

### III.

As earlier noted, Pappas also objected to the provision of the release drafted for Chang by Madden dividing payment of the $100,000 into two separate checks, both payable to Pappas: one from Chang's liability insurance carrier for $29,999.99 "in settlement of all claims against" Chang, and the other from Chang personally for $70,000.01.

The strange addition of one cent to the round number of dollars ($70,000) required to be paid by Chang and corresponding subtraction of that amount from the round number of dollars payable to Pappas by Chang's insurer was explored at trial. During cross-examination of Chang, Pappas's then counsel asked her: "What's the reason for the odd number here"; did she have "a $30,000 policy or a million dollar policy?" Asked by the court the relevance of the issue, counsel responded that it sought to elicit whether "there was any other reason for this other than the fact it was designed to

---

[2] Pappas's anger at these efforts is what apparently led her to ultimately refuse to include any confidentiality provision in the parties' release agreement even after Madden agreed to add language permitting Pappas to proactively contact the Board.

4

evade the reporting requirement?"  Madden then objected on the ground that the defense was "being put in a position where they potentially have to waive privileges [i.e., the mediation and attorney client privileges] in order to disclose the reason for a structure that has no bearing on the relevant issues in this case."

After this objection was overruled and counsel asked, "is your policy more than $29,999?" Chang stated that it was, and admitted her coverage was "sufficient to cover the whole hundred thousand dollars."  When asked whether, outside what she learned in the mediation, Chang could "think of any reason why the insurance company would only pay $29,999.99, the trial court sustained the objection on the ground the question called for speculation.

To the question "why did you agree to kick in the $70,000," Chang answered, "that is the way that it had to be in order for me to get this settled. It was not going to settle at $29,999.  That was made clear."  Asked "why did you do that rather than your insurance company," Chang answered, "Because I wanted to have this—have a chance at being done and be behind us, in a mutually agreeable way."  Chang's responses evasively begged the questions put to her.  The record provides no reason to think the settlement required Chang to personally "kick in" anything; nor is there reason the matter would be any less "done" and "behind us" or "mutually agreeable" than if the entire amount required by the settlement was paid by Chang's insurer, as is ordinarily the case and Pappas presumably expected.

Asked why Chang found it necessary to pay a penny more than $70,000, Madden objected, claiming counsel was "seeking privileged information," and the objection was sustained.  But if, as Chang said, all she cared about was putting the case behind her in a mutually agreeable way,

5

she would not have sacrificed that goal by letting the insurance company pay the entire amount required to settle Pappas's claims.  And if, as does not appear, there was a legitimate reason for Chang to personally contribute substantially more to the $100,000 settlement than was asked of the insurance company, any two payments that added up to that amount would suffice, and there would be no need to add a penny to the amount provided by Chang and account for that by correspondingly subtracting the penny from the amount to be paid Pappas by the insurer.  The purpose of the curiously divided payment called for greater attention than the trial court paid.

The most plausible explanation for Chang's scheme appears to be that it ostensibly provided her a basis upon which to achieve two mutually exclusive goals.  She could represent to her liability insurer that Pappas's claims were all settled for less than $30,000 and the settlement therefore did not need to be reported to the Board, and at the same time, fulfill her duty to pay Pappas the real amount of the settlement, which was more than three times $29,999.99, to satisfy Pappas's claims and avoid litigation.  In effect, Chang paid $70,000.01 to ensure she would not be investigated and possibly disciplined by the Board.

Chang's defense that she paid the $70,000.01 simply to be "done" with the dispute and "put it behind" her can be deemed acceptable only by the willful suspension of disbelief.  The unlawful purpose of the division of the two payments Chang insisted upon speaks for itself, res ipsa loquitor; it is sufficient in and of itself to support a finding of unlawful obstruction of the Medical Practice Act, because no innocent purpose for the subtraction of a cent from the statutory amount that would require reporting of the settlement to the Board can be found in the record or even imagined.

6

## IV.

The reader may at this point wonder at the trial court's (and my colleagues') lack of concern about Chang's unlawful efforts to prevent Pappas from complaining to the Board. The reason, my colleagues explain, is that the trial court expressly and justifiably found that the full payment of the $100,000 settlement amount was disclosed by Chang in the June 6, 2018 release drafted for her by Madden. In support of this determination, the majority points to the statement of decision, which states that "[t]he 7/6/18 Release (which the insurer would no doubt require before making payment) clearly states that the amount of the settlement is $100,000 and obligates the insurer to report the settlement to the Medical Board."[3] (Maj. opn. at p. 21.)

However, as the record demonstrates, the trial court's statement is not accurate.

The proposed July 6, 2018 release does not state that the amount of the settlement was $100,000; nor does it obligate the insurer to report the settlement to the Board. Rather, the release states that the $29,999.99 payable to Pappas by Chang's professional liability carrier was "in settlement of all claims against Carolyn Chang, M.D.," and specifies no purpose at all for Chang's payment of $70,000.01, which is simply listed as a separate item consideration for the release. The July 6 release did not just fail to disclose that the full amount of Chang's settlement with Pappas was $100,000; because it stated the amount paid "in settlement of all claims" was less than

---

[3] The parenthetical observation that "the insurer would no doubt require [a copy of the July 6 release] before making payment" appears speculative. Nothing in the record establishes that there is no other way an insurer of professional liability could ascertain the amount of a covered settlement; or that the insured physician or surgeon could not find another acceptable way to inform the insurer of the amount.

7

$30,000 ($29,999.99), the release disingenuously created the appearance that the settlement did not need to be reported to the Board.

The most significant aspect of the proposed July 6 release is not that attached to it by the trial court, but its telling revelation of Chang's unlawful intent. It is ironic that the trial judge exonerated Chang on the basis of such a damning document.

## V.

The efforts in this case to obstruct enforcement of the Medical Practice Act are not the sort that ordinarily see the light of day, but they may not be uncommon. It is therefore useful to expose them, when that can appropriately be done, as a means of alerting and assisting agencies that regulate the medical profession as well as the Legislature. This is appropriate here because sections 801.01 and 2220.7 have never previously been judicially construed in a published opinion. Publication is warranted because the majority opinion "[i]s accompanied by a separate opinion concurring or dissenting on a legal issue, and publication of the majority and separate opinions would make a significant contribution to the development of the law." (Cal. Rules of Court, rule 8.1105(c)(9).)

8

_____

Kline, J.*

_Pappas v. Chang_ (A159792, A160293)

&ast; Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Honorable Mary Wiss |
| Attorney for Plaintiff and Appellant, Helena Pappas: | Helena Pappas, in pro per; |
| Attorney for Amicus Curiae Centers for Public Interest Law on behalf of Plaintiff and Appellant: | Consumer Protection Policy Center, Karen T. Stefano; |
| Attorney for Defendant and Appellant, Carolyn Chang: | Law Offices of Madden & Lynch, PC, Elisabeth A. Madden, Frances Bruce. |